**In re Ronald Marc CHERRY, Debtor.**

**No. 08–11992–BKC–RBR.**

United States Bankruptcy Court, S.D. Florida, Broward Division.

Nov. 19, 2008.

---

Brian J. Cohen, Esq, Coral Springs, FL, for Debtor.

### ORDER DENYING MOTION TO CONVERT CASE TO CHAPTER 13
### [D.E. 150]

RAYMOND B. RAY, Bankruptcy Judge.

THIS MATTER came before the Court for hearing on October 20, 2008, upon the

Motion to Convert Case to Chapter 13 (the "*Motion to Convert*") [D.E. 150], filed by the Debtor, and the objections thereto (collectively, the "*Objections*") [D.E. 158 and D.E. 161], filed by the Trustee and Sentra Securities Corporation, now known as AIG Financial Advisors, Inc. ("*Sentra*" or "*AIG*"). At the hearing, the Court considered the Debtor's oral testimony and trial exhibits (Ex. 1–8), as well as trial exhibits (Ex. A–T) offered by the Trustee and AIG. The Court also considered the contents of the case file [D.E. 1–170], with specific consideration given to the Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(3) [D.E. 47].

Having reviewed the above materials and being otherwise duly informed, the Court makes the following findings of fact and conclusions of law.

## *FINDINGS OF FACT*

On February 21, 2008, the Debtor filed a chapter 7 bankruptcy petition. Sonya Salkin was appointed as the chapter 7 trustee. AIG as assignee is the major creditor. The Trustee filed an objection to the Debtor's discharge on July 15, 2008 (Adv. Case No. 2008–01444–RBR). AIG filed an objection to discharge on July 31, 2008 (Adv. Case No. 2008–1507–RBR). The Debtor filed the Motion to Convert in response to these adversary proceedings. Both the Trustee and AIG oppose the Motion to Convert.

The Debtor has worked in the insurance and securities industries for over thirty (30) years. On August 19, 1993, the Debtor formed Seniors Insurance Agency of South Florida, Inc. ("*Seniors*"), which sold securities, viatical health insurance, and other regulated products, as well as non-regulated insurance products. Regulatory requirements mandated that Seniors employees who sold securities maintained a securities license through a licensed broker who was a member of the NASD (now FINRA).[1]

From 1995 through April 30, 2003, the Florida Secretary of State listed the Debtor as the sole officer and director of Seniors. The Debtor's wife, Pamela Cherry ("*Pamela*"), was the Vice President of Seniors from May 2003 until May 2005, when she was deleted as an officer of the company. Since May 2005, the Debtor has been the sole officer and director of Seniors.

From August 2000 through May 2004, the Debtor maintained his securities license through Sentra, a broker-dealer and member of the NASD (now FINRA). The Debtor was a successful securities salesman at both Sentra and Seniors. Specifically, Sentra paid the following amounts to the Debtor as non-employee compensation for the years 2000–2004:

SENTRA 1099–MISC for 2000: $673,725.49;

SENTRA 1099–MISC for 2001: $1,416,690.08;

SENTRA 1099–MISC for 2002: $923,232.17;

SENTRA 1099–MISC for 2003: $600,384.62;

SENTRA 1099–MISC for 2004: $264,237.68.[2]

The above amounts only reflect commission income the Debtor generated at Sentra for securities products. They do not

---

1. The National Association of Securities Dealers, Inc. ("*NASD*"), now known as the Financial Industry Regulatory Authority, Inc. ("*FINRA*"), is the largest non-governmental regulatory for all brokers/dealers doing business in the United States.

2. The $264,237.68 figure reflects approximately six months of compensation from Sentra to the Debtor. Sentra discharged the Debtor in June 2004.

include commissions that the Debtor received during these years for insurance and other fixed products that Sentra did not process.

Seniors' tax returns for the tax years 2000 through 2005 reflect the following gross receipts for the years indicated (including both securities and insurance products):

| Year | Gross Receipts |
|------|----------------|
| 2000 | $2,074,621.00 |
| 2001 | $1,924,842.00 |
| 2002 | $2,295,004.00 |
| 2003 | $1,282,754.00 |
| 2004 | $1,135,464.00 |
| 2005 | $ 425,369.00 |

Sentra discharged the Debtor in June 2004. In November 2004, Sentra commenced an arbitration proceeding with NASD Dispute Resolution wherein Sentra sought payment on a promissory note owed by the Debtor, and commission advances made to the Debtor. The arbitration was scheduled for hearing. The Debtor sought various postponements and delays from 2004 until February 25, 2008. On February 21, 2008, the Debtor filed a voluntary chapter 7 petition in an effort to stop the arbitration and discharge the above-referenced debt.

Just two months after Sentra commenced the NASD Arbitration proceeding, Pamela formed Cherry & Cherry, Inc. ("C & C"). C & C is a Florida corporation with its principal place of business in Broward County. Prior to February 2008, its principal address was 7124 N. Nob Hill Road, Tamarac, Florida 33321 (the "Nob Hill Office"), the same address and location used by Debtor's other company, Seniors.

Each member of Debtor's family, with the exception of him, has held a position at C & C as an officer or director. Pamela is the President, Treasurer, Director, and 50% shareholder of C & C. Justin A. Cherry ("Justin"), the son of the Debtor, is the Vice–President, Secretary, Director, and 50% shareholder of C & C. Jill Cherry ("Jill"), the daughter of the Debtor, was the Vice–President, Secretary and a Director of C & C at the time the Debtor filed his bankruptcy petition. Pamela, Justin, and Jill held these positions despite the fact the Debtor generated most of the commissions for C & C.

After Sentra terminated the Debtor, he and certain of his family members needed to locate another broker/dealer affiliation to enable them to continue their securities business. The Debtor and Justin subsequently entered into contracts with Independent Financial Group ("IFG"), an NASD/FINRA member firm in or about September 2004. However, due to the number of customer complaints filed against the Debtor and other matters, it took the Debtor approximately one year to obtain regulatory approval to transfer his securities license to IFG. He was approved to once again sell securities in Florida in or about July 2005. In the meantime, the Debtor sold insurance products to members of the public through Seniors or C & C.

Seniors has remained in business even after January 2005, but it did not conduct any new business. Since at least January 2007, Seniors' only income has been from renewals of insurance policies.

Seniors and C & C are engaged in substantially the same business. On March 31, 2005, Pamela wrote a letter to ECA Marketing, Inc. on Seniors' letterhead, to advise that Seniors was "changing our corporate name from Seniors . . . to Cherry & Cherry, Inc.". On February 27, 2008, Equi-Trust Life Insurance Company wrote to Pamela (care of Seniors) confirming that Seniors' address had changed effective February 26, 2008. It was not until March

20, 2008 that Pamela wrote to EquiTrust to advise that Seniors is "inactive and has been changed to ... Cherry & Cherry Inc."

At the time C & C was created, all of Seniors' personnel became employees of C & C. Seniors' existing customers remained customers of the C & C employees that Seniors formerly employed.

C & C did not comply with certain corporate formalities. Stock certificates were never issued to any shareholders and no shareholders' meetings or board of directors' meetings have ever been held. The practices and procedures of C & C were the same as those of Seniors. C & C and Seniors also employed the same method for obtaining business and marketing. From January 2005 through late January or early February 2008, Seniors and C & C were located at the Nob Hill Office. C & C did not have its own lease for the Nob Hill Office; that office was leased by Seniors. At least until January 2008, Seniors and C & C utilized the same phone number. The letterheads of C & C and Seniors were used interchangeably.

C & C's corporate funds were routinely and consistently used to pay the Debtor's personal debts and expenses for no consideration, including the Debtor's cell phone, car payments, car insurance, car repairs, SunPass, life insurance payments, and attorneys' fees. C & C did not pay for the same personal debts and expenses of other family members. For example, C & C paid for the Debtor's attorneys' fees related to filing this bankruptcy, but did not pay Justin's attorney's fees related to a personal dispute. C & C also does not pay for Justin or Pamela's cellular phone, car payments, car repairs, or life insurance.

In a March 6, 2008 Broker Check Report filed with FINRA, the Debtor indicated that his current affiliation was as "an insurance agent, fixed life and annuities

and health through Cherry & Cherry, Inc., President...." The Debtor claimed during his testimony that he signed this document in error, without first reading it.

The Debtor generated, from his own personal efforts, the following commissions in 2007, all of which were paid to C & C:

a. According to the commission statement generated by IFG, between January and December 2007, the Debtor generated $2,547,042.21 in total sales, which generated a commission of $150,318.93, plus $48,662.45 in commissions from overrides, for a total of $181,781.09.

b. The 1099–MISC issued by IFG to the Debtor indicates that the Debtor earned $171,296.92 in commissions in 2007.

c. The 1099–MISC issued by National Financial Partners indicates that the Debtor generated $11,581.69 in commissions in 2007.

d. The General Agent Statement of Account issued by United American Insurance Company indicates that the Debtor generated $10,684.43 in commissions in 2007.

e. Other commissions were generated by the Debtor, but he did not receive an individual 1099; rather, a 1099–MISC was issued to C & C. For example, a 1099–MISC was issued by American Investors Life Insurance Co., Inc. to C & C for $377,863.99 in commissions.

The Debtor's sales were indeed so substantial, that he won a nationwide contest and received a nine-day, fully paid trip to Switzerland for himself and Pamela.

However, the Debtor does not receive any of his commissions earned through his employment with C & C. He instead receives a small salary. The Debtor lists following income from his employment

with C & C in his statement of financial affairs:

| Year | Salary |
| --- | --- |
| 2006 | $30,457.00 |
| 2007 | $28,597.00 |
| January–March 2008 | $ 7,800.00 |

## CONCLUSIONS OF LAW

Pursuant to 11 U.S.C. § 109(e), the Debtor seeks to convert his pending chapter 7 case to one under chapter 13. § 109(e) provides in part that:

Only ... an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition non-contingent, liquidated, unsecured debts of less than $336,900; non-contingent, liquidated, secured debts of less than $1,010,650 may be a debtor under Chapter 13 of this title.

AIG and the Trustee object to the conversion on the grounds that the Debtor: (a) lacks the regular income that § 109(e) requires, and (b) is attempting to convert is bad faith.

### A. Regular Income

A Debtor must have "regular income" sufficient to make payments under a plan to convert a case to chapter 13. *In re Donohue*, 81 B.R. 714, 715 (Bankr. S.D.Fla.1987) (citing *Tenney v. Terry (In re Terry)*, 630 F.2d 634 (8th Cir.1980)). A debtor must produce regular income through his own personal efforts. *Stella v. Gov't Dev. Bank of P.R.*, 663 F.2d 326, 329 (1st Cir.1981).

According to his Second Amended Schedules [D.E. 170], the Debtor and Pamela have a combined average monthly income of $11,201.66. With monthly expenses of $4,385.92, the two have a monthly net income, on paper, of $6,815.74. This amount is sufficient to make the $6,804.91 monthly payments outlined in a proposed chapter 13 plan (the *"Plan"*) [D.E. 170].

However, the Debtor and Pamela only produce a combined $4,701.66 in net monthly take home pay. Pamela produces the remaining $6,500 of their average monthly income via $3,500.00 in "regular income from operation of a business," and $3,000.00 listed under "other monthly income." The Debtor lists the latter contribution without further explanation, other than Pamela's statement in an affidavit that she will make the contribution to the household expenses. At the October 20, 2008 hearing, the Court had the following exchange with the Debtor on this issue:

THE COURT: Then what is the $3,000 family contribution that she is talking about, where is that coming from?

THE WITNESS: That's from—she had—that's from her own income that she has.

THE COURT: But you told me she hasn't got an income other than Cherry & Cherry?

THE WITNESS: That I know of, but I know she has income. I don't know where or what, we don't discuss that, sir. She's not a liar. If she said that she would, she will.

THE COURT: And Pamela Cherry is not here to testify today?

THE WITNESS: No, she is not.

THE COURT: And in her deposition is this covered?

MR. ZEENA: No, your Honor.

THE COURT: So I have no evidence to support the allegations contained in the statement of contribution and it's basically being impeached by your own documentation. All right. The witness may step down.

A non-debtor spouse's income must be sufficiently regular and stable to qualify as regular income of the Debtor.

*In re Antoine,* 208 B.R. 17, 19 (Bankr. E.D.N.Y.1997) (finding that gratuitous payments by family members do not, as a general rule, constitute 'regular income' for purposes of chapter 13 eligibility requirements). The Debtor testified that Pamela had no income apart from C & C and could not identify the source of the additional $3,000.00 contribution. The Debtor did not list this contribution on his previous schedules [D.E. 19 and D.E. 34]. Pamela herself did not testify at the hearing. The Court thus cannot describe the $3,000.00 contribution as either regular or stable.

Additionally, Pamela has no duty to make this contribution. She is not jointly liable on any of the claims in this case, other than secured claims, and she is allegedly not dependent on the Debtor for her income. Without contributions from Pamela, the Debtor seems incapable of proposing a feasible plan.

Given the questions about the $3,000.00 contribution, the Court finds that the contribution cannot be classified as "regular income" under § 109(e). Without the benefit of this contribution, the Debtor cannot make regular plan payments.

**B. Good Faith**

A Chapter 13 plan must meet the nine criteria delineated in 11 U.S.C. § 1325(a). In particular, § 1325(a)(3) requires that a plan has been proposed in good faith.

■ The Eleventh Circuit has held that courts should consider the following list of relevant factors when determining whether a plan has been proposed in good faith:

(1) amount of debtor's income from all sources;

(2) living expenses of debtor and his dependents;

(3) amount of attorney fees;

(4) probable or expected duration of debtor's Chapter 13 plan;

(5) motivations of debtor and his sincerity in seeking relief under provisions of Chapter 13;

(6) debtor's degree of effort;

(7) debtor's ability to earn and likelihood of fluctuation in his earnings;

(8) special circumstances such as inordinate medical expense;

(9) frequency with which debtor has sought relief under Bankruptcy Reform Act and its predecessors;

(10) circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; and

(11) burden which plan's administration would place on trustee.

*In re Kitchens,* 702 F.2d 885, 888–89 (11th Cir.1983).

■ As stated, the Debtor's regular income is not enough to fund the Plan. The Debtor displayed a disturbing lack of knowledge concerning his own schedules and Pamela's contributions to the Plan. Finally, the Debtor has clear motivation for converting his case to chapter 13. Absent conversion, the Debtor risks the loss of his discharge and the dischargeability of the debt of his single largest creditor. Without a discharge, the Debtor may lose his securities license. Viewed in light of the *Kitchens* factors, these facts suggest that the Debtor is not seeking to convert his case to chapter 13 in good faith. *See Kitchens,* 702 F.2d at 888–89.

■ The Court may also examine the Debtor's pre-petition actions for evidence of a lack of good faith. *Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 127 S.Ct. 1105, 1110–11, 166 L.Ed.2d 956 (2007). The facts of this case indicate that the Debtor transferred his business (Sen-

iors) to certain family members in a manner designed to defraud Sentra. This behavior also illustrates a lack of good faith on the part of the Debtor.

### CONCLUSION

The Court finds that the Debtor lacks the regular income to make sufficient to make payments under the Plan and is not attempting to convert his case to chapter 13 in good faith. Accordingly, pursuant to 11 U.S.C. §§ 109(e) and 1325(a)(3), it is

**ORDERED** that the Motion to Convert [D.E. 150] is **DENIED.**